BEER, Judge.
This is executive officer liability litigation. Judgment was rendered dismissing plaintiff’s suit against Aetna Casualty and Surety Co. (the only defendant), and he appeals. The trial court’s written reasons for judgment are quoted in full as follows:
“It is the opinion of the Court that the negligence of the Plaintiff, Matthew Gustain, was the sole cause of his accident.”
A summary of the evidence is offered in light of the Supreme Court’s manifest error mandate set forth in Canter v. Koehring, 283 So.2d 716 (La., 1973).
*370 Plaintiff-appellant, Matthew Gustain, worked for Aetna’s insured, Celotex Corporation, at its plant in Donaldsonville, Louisiana, as a brakeman. The plant’s principal endeavor was the baling and storage of bagasse, the by-product of an adjacent sugar mill. The baled bagasse was loaded on flatbed railroad cars pulled by a small locomotive to a storage field via tracks that encircled the baling station and the storage area.
After the flatbed cars had been loaded with baled bagasse, Gustain had the job of connecting or coupling these loaded cars to the locomotive. Then, as the train left the baling station, he boarded the last flatcar, after adjusting the track switches which regulated the'train’s return trip. His job further required him to disconnect the loaded flatcars from the locomotive when the train reached the storage area and, thereafter, he was obliged to connect or couple (to the front of the locomotive) the unloaded cars (remaining from an earlier trip) which the small locomotive then pushed to the baling station for reloading. The coupling and uncoupling of the flatcars was accomplished by removal or insertion of a metal pin, as the situation required. How Gustain was instructed to accomplish these tasks is in conflict.
Gustain was hired on October 26, 1970, and received on-the-job training from the operator of the train, Martin Dickerson, at the direction of Dickerson’s supervisor, G. P. LeBlanc. Gustain testified that Le-Blanc briefly discussed the operation of the switches and the balance of his instructions were received from Dickerson, who, according to Gustain, proposed several options for performing the coupling and uncoupling operations.
Gustain contends that he was advised by Dickerson that the best method for doing the required work obliged Gustain to jump from a moving flatcar near a lighted spot on a road adjacent to the track that was referred to as the “wide area.” After doing the necessary uncoupling, he was to catch up with the then slowly moving locomotive and board it by first grabbing onto a handrail on its side. Standing on a step adjacent to the cab, he would reach into the cab for the pins utilized in coupling the flatcars that were to be returned to the plant. According to Gustain, he was obliged to uncouple the loaded flatcars and, thereafter, connect the empties to be returned for loading with the train never coming to a full and complete stop.
On the night of December 7, 1970, Gus-tain attempted to climb aboard the moving locomotive, slipped, and, as a direct result, sustained serious injuries to his left foot, resulting in loss of his toes. He testified that the ground was wet and the tracks covered by damp bagasse and other refuse.
Gustain’s testimony regarding the instructions he received for carrying out his job requirements are in serious conflict with that of LeBlanc and Dickerson.
LeBlanc contends that he gave Gustain a general run-down as to his duties and then turned him over to Dickerson for further particular instructions after first clearly warning him not to jump to or from the moving train.
Dickerson testified that he issued instructions to Gustain consistent with the directions received from LeBlanc. He testified that he never instructed Gustain to jump off or on the moving train, nor did he have knowledge of his alleged jumping off or on the train prior to the night of the accident. He indicated that the jumping procedure alleged to have been part of his instructions to Gustain was not, in fact, ever proposed or suggested by him and was not a safe procedure due, among other considerations, to the location of a ditch adjacent to the tracks.
He did not observe Gustain jump from the train prior to or on the night of the accident. Contrary to Gustain’s testimony, he observed that there was no rain that night and testified that the ground was not damp.
*371 Both LeBlanc and Dickerson testified that the train comes to a full stop in the . field and both insist, contrary to Gustain’s contention, that forward movement ceases before the brakeman is obliged to commence his coupling or uncoupling exercise.
LeBlanc testified that he told Gustain that he was to stay on the train until it reached a full stop. He issued these instructions to Gustain in the presence of Dickerson at the time Gustain was hired.
Dickerson testified that he instructed Gustain to do the job as he, himself, did when he was a brakeman. After boarding the train, Gustain was instructed to remain on the last car until the train stopped at the unloading point. Dickerson is certain that he never instructed Gustain to jump off or on the moving train.
LeBlanc inspected the field operations on a daily basis and never observed a brakeman jumping from the train until it reached its usual stopping point in the storage field. He further observed that the tracks are cleaned during each shift and are not encumbered with bagasse or its residue.
Two other witnesses, Ray Blouin and Clifton Joseph, Sr., offered little additional information. Blouin’s work at the plant was not related to the train operation. Joseph added nothing to the description of operations in the field. He did, however, testify that on the night of the accident, he had, earlier, cleaned the tracks in the area where the accident took place and, like Dickerson, contradicted Gustain’s observation that the area was wet and relatively encumbered with bagasse refuse.
Only Ulysse Daigle’s testimony seems to corroborate, to some extent, Gustain’s assertion that the brakeman is required to jump off and on the moving train. Daigle was a brakeman on a different shift and testified that he had observed the train continue to move during the coupling and uncoupling procedure although he did not state that he had been instructed to do his work while the train was moving.
Although the testimony of LeBlanc and Dickerson contradicted Gustain’s contention as to how he was instructed to perform his duties, the trial court did not comment directly on this conflict in the evidence. Nevertheless, the court concluded that Gustain’s injury resulted solely from his own negligence which, to us, signals a finding that Gustain did not follow the instructions issued by LeBlanc and Dickerson.
Able counsel for appellant observes in his extensive brief that “The question here is one of creditability of the witnesses,” and further avers, in brief, that “the (trial) judge reached (his) conclusion through a gross misinterperatation (sic) of the facts.”
We agree that any finding of negligence on the part of Gustain or attributable (directly or by imputation) to Aetna’s insureds rests upon credibility determinations made by the trier of the facts. However, we do not find support in the record for any contention that the trial court manifestly erred in its credibility determinations or its factual findings or that it “misinterpreted” the facts found. There is ample evidence to sustain the credibility determination which was obviously made by the trial court, as well as the court’s interpretation of those findings in framing its judgment. Accordingly, it becomes unnecessary and would serve no useful purpose to consider the remaining issues that would otherwise have to be dealt with.
This was a most unfortunate accident resulting in serious and permanent injuries to a young man only just starting out in life. We are much in sympathy with him and very hopeful that the eventual results of his extensive medical treatment will be excellent.
The judgment of the Civil District Court for the Parish of Orleans is affirmed. Each party is to bear its own costs of this appeal.
AFFIRMED.